IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SHAY NEACE, *et al.*, | ) | CASE NO. 5:04CV545 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Judge John R. Adams |
| | ) | |
| PERRY TOWNSHIP, OHIO, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | <u>MEMORANDUM OF OPINION</u> |

On March 19, 2004, Shay Neace and Michele Neace, plaintiffs, filed this action pursuant to 42 U.S.C. § 1983.  On April 29, 2005, Defendants Perry Township, Ohio and its Board of Commissioners, and Defendant William Watson, filed a joint Motion For Summary Judgment (Docket No. 52).[1]  On June 1, 2005, Defendant City of Massillon, Ohio filed an additional Motion For Summary Judgment (Docket No. 63).  The parties have fully briefed the issues, and oral argument was held on January 9, 2006.

---

[1]      This is Defendant Watson's second motion for summary judgment on qualified immunity.  He filed his first motion for summary judgment on August 24, 2004 (Docket No. 20) prior to any significant discovery.  On September 30, 2004, the Court (J. Dowd then presiding) denied the motion on the ground that the allegations as of that date left unresolved factual issues (Docket No. 23).

For the following reasons, the motions are DENIED.

## I.  FACTS

Plaintiff Shay Neace alleges that Defendant Watson, an officer of the Perry Township police department, used excessive force during a drug raid.  The Plaintiff asserts that the municipal defendants are liable for Officer Watson's conduct.

In the evening of March 20 and into the early morning of March 21, 2003, the Plaintiff attended a party with his girlfriend, Samantha Miller, at the home of Nicholas Estep, located in Massillon, Ohio.  He arrived at around 10:00 p.m, and the house was full with over twenty people.  The Plaintiff and his girlfriend intended to leave the party when it was over and not stay the night.  The Plaintiff drank as much as a six-pack of beer in the hours prior to the drug raid.  (Neace Dep. at 30,-31, 42-43, 47, 54, 55-56-58, 69.)[2]

As the party continued, officers of the Massillon and Perry Township police departments, including Officer Watson, prepared to raid the home as part of a joint drug investigation, the target of which was Estep.  Officer Watson was dressed in plain clothes, but he alleges that over his clothes he wore a jacket emblazoned with the word "police".  (Watson Dep. at 112-13.)

Around 1:30 a.m., the Plaintiff and three others went into the upstairs bathroom to roll marijuana joints. There was a gun in the bathroom that the Plaintiff had obtained earlier from Estep's bedroom.  The Plaintiff testified at deposition that he disassembled the gun into three pieces while in the bathroom to determine whether the gun was loaded.  Within minutes, there

---

[2]     The deposition transcript of Shay Neace, taken on January 25, 2005, is Docket No. 56.  He also submitted an affidavit as Exhibit B to his opposition to summary judgment, Docket No. 71.  The deposition transcript of Officer Watson, taken on November 22, 2004, is Docket No. 57.

was a commotion outside the bathroom door.  The Plaintiff had the gun pieces in his hand when
the commotion commenced.  (Neace Dep. at 57-58, 69, 75-77; <u>see</u> <u>also</u> Shay Neace Aff. at ¶ 11
regarding the disassembled gun.)

The parties give conflicting accounts with regard to what happened next.  The Plaintiff
testified at deposition that he heard a commotion outside the bathroom door, and he did not know
that the man he encountered was a police officer:

Q.    Was there a knock at the door before?

A.    Nope.

Q.    So you don't recall anyone knocking on the door?

A.    I don't recall anyone at all knocking on the door.

. . .

Q.    So you hear the commotion.  As you're pushing the [bathroom] door out, what
        happens?

A.    I see a barrel of a gun at my head.

Q.    Well, did the person – or did someone to your knowledge pull the door open?

A.    To my knowledge, yeah.

Q.    And when you see the barrel of a gun, who's holding it?

A.    I didn't know who he was.

Q.    Before this period of time, had you heard the people yelling police or anything
        like that?

A.    No.

Q.    You just knew there was some commotion?

A.    Yes.

. . .

Q.      Did the person with the gun say anything?

A.      Get the fuck down.

Q.      Did you see any insignia at all that this was a police officer?

A.      No.

(Neace Dep. at 77-79; <u>see also</u> Shay Neace Dep. at 116-17; Neace Aff. at ¶¶ 3-4, stating there

was no indicia that the man he encountered was a police officer.)

The Plaintiff  testified as follows with respect to what occurred during the encounter with

Officer Watson:

Q.      Well, when you open the door to the bathroom, you had the gun in your hand,
        didn't you?

A.      Yes.

Q.      In your right hand?

A.      Yes.

Q.      With three pieces?

A.      (Witness nods head.)

Q.      That's true?

A.      Yes.

Q.      And its your testimony that the gun was not intact, but it was stripped down and
        all three pieces were being held in your right hand?

A.      Yes.

Q.      So which hand do you use to open the door; your left hand?

A.      Yes.

Q.     So when the gun is in your face and you hear, get the F down, do you go down?

A.     No.

Q.     What do you do?

A.     Dropped what was in my hand and grabbed the barrel of that [Officer Watson's] gun.

Q.     Now, the gun that was in your right hand, were you holding the actual frame of the gun by its handle?

A.     No, I think I had the whole gun palmed, like just grabbed up in my hand.  You know what I mean?

Q.     But the gun barrel was facing away from you?  In other words, you had the gun palmed, but the barrel of the gun was facing away from your body?

A.     Right, facing towards the –

Q.     So if you had the gun palmed in your right hand, the barrel was projecting from your hand and this handle was also outside your hand?

A.     Outside my hand, yes.

(Neace Dep. at 81-82; <u>see</u> <u>also</u> Neace Aff. at ¶ 11.)

The Plaintiff grabbed Officer Watson's gun and a struggle ensued.  (Neace Dep. at 80-88.)  The Plaintiff testified at deposition that the entire incident lasted about fifteen seconds, if that.  During the struggle, three shots were fired from Officer Watson's gun.  The first shot was off to the right of the Plaintiff's body.  The shot startled the Plaintiff, and he allegedly let go of Officer Watson's gun.  (Neace Dep. at 86-88.)

The Plaintiff testified as follows with respect to the actual shooting.

Q.     When the gun discharges the first time, what do you physically do at that point?

A.     Let go, put my arms up like that, backed up.

Q.     And what you're demonstrating is you bring both of your hands, palms facing

-5-

away?

A.    Yeah.

Q.    And take a step back?

A.    Yes.

Q.    What happens then?

A.    I was shot in the shoulder.

. . .

Q.    So the second round hits you in the shoulder.  What do you physically do at that point?

A.    Fell to my knees.  I mean, it hurt.  Hurt so bad.

Q.    Now, when you say you fall to your knees, do you recall how it was you went down?  Did you go backwards?

A.    Straight down.

Q.    You went straight?

A.    Straight down.

Q.    In front of you?

A.    Right.  Fell forward, face down.

Q.    So the impact of the bullet didn't blow you back?

A.    It was enough to take me back, but I mean – not knock me back.

Q.    That's what I'm asking.  The impact of the round did not push you back; you actually fell forward?

A.    Right.

Q.    And did you fall forward because you were buckled by the shot or you intended just to drop at that point?

-6-

A.      Both, I mean the shot made me buckle.

Q.      And you were actually toward him as you were going down?

A.      Right.

Q.      Were both hands in front of you?

A.      I don't recall.  I think so.  I was trying to stop my fall.

Q.      So you had the presence – you had to think about breaking your fall as you were going forward?

A.      Yeah.

Q.      Now, where were you when the third shot came out?

A.      On my hands and knees, almost on my stomach.

Q.      Were you still going down?

A.      Yeah.  I was down already.

Q.       Your knees were on the ground?

A.      Yeah.

Q.      Were you actually on the ground, stopped?  Your momentum had stopped and you were down and then shot?

A.      I was on the floor, my momentum was stopped.

Q.      What was the time lag between the two shots that hit you?

A.      I couldn't even tell you.

Q.      Well, you heard Officer Watson's testimony that it was tac, tac, tac?

A.      No, it wasn't that fast.

. . .

Q.      Shay, I just have really one question about something that I just want to make sure I'm clear.  Can you tell me what your position was at the time of the third

shot?  I mean, were both knees on the ground?  Was [sic] you both hands on the ground or were you – part of your body on the ground, part not on the ground?  I'm just trying to get an understanding.

A.    I'm pretty sure I was on my way like – I was already hands and knees down, on my way.

Q.    But you were still --

A.    Still falling.

Q.    Still falling?

A.    Still falling.

(Neace Dep. at 88, 90-92, 96-97; see also Shay Neace Aff. at ¶¶ 6-7.)

In support of his version of events, the Plaintiff has submitted affidavits of two others who were in the bathroom: Seth Neace, the Plaintiff's brother, and David Heffelfinger.  They corroborate the lack of any police identification by Officer Watson, that the Plaintiff backed off and raised his hands after the first shot, and that the gun the Plaintiff had was disassembled.  (Seth Neace Aff. at ¶¶ 3, 4, 6, and 10; Heffelfinger Aff. at ¶¶ 3, 4, 5, and 9.)  The Plaintiff also offers the affidavit of his treating physician that day, Dr. Joseph Saadey.  Dr. Saadey states that the shot to the Plaintiff's back had to have traveled in a downward trajectory from above his body.  (Saadey Aff. at ¶ 7.)[3]

Officer Watson gave the following, very different, account during his own deposition.  He testified that he wore a jacket with the word "police" upon it.  Upon entering the house, other officers yelled exclamations like "police", "search warrant" and the like.  Officer Watson's role

---

[3]     The affidavits of Seth Neace, Heffelfinger, and Dr. Saadey are attached as Exhibits C, D, and F respectively to the Plaintiff's opposition to summary judgment, Docket No. 71.

was to find the way upstairs and secure the second floor.  He testified that when he arrived on the

upstairs landing, he encountered the Plaintiff outside the bathroom with a gun in hand.  (Watson

Dep. at 112-13, 115, 118, 123-27.)

Officer Watson testified as follows with respect to his initial encounter with the Plaintiff:

Q.    Where were you pointing it [your gun] at?

A.    I was pointing it straight ahead in my direction where I was going.

Q.    Which was the bedroom?

A.    Yes.

Q.    But you were looking to your left.  Is that your testimony?

A.    No, I was looking forward, and then something – a movement to the left caught
      something, and then I glanced over to the left.

Q.    And when you glanced over, you saw a gun?

A.    I saw a gun coming towards me.

(Watson Dep. at 128.)  He described the shooting as follows:

Q.    Is it fair to say that – my understanding is that the first, second and third shots
      were fired in quick succession?

A.    That's correct

Q.    Would this be the approximation of where both of you were for the first, second
      and third shots?

A.    Yes.

Q.    Do you remember if Mr. Neace was falling to the ground at this point in time
      during the first, second, and third shots?

A.    No.

Q.    Did Mr. Neace fall face-forward or backwards?

-9-

A.      I believe it was face-forward.

Q.      When he ended up resting, was he face-forward on the floor?

A.      I believe so.

Q.      Is it fair to say that you cannot remember whether Mr. Neace was falling down when you fired your third shot?

A.      I was looking in the barrel of the gun.  I really wasn't – I don't recall – he didn't fall until after I fired the three shots.  But our bodies were in funny positions.  We were both leaning forward trying to create distance, so it's kind of hard to say because we were both leaning forward.

Q.      But there was enough space though that he was pointing a gun at you?

A.      Yes.

. . .

Q.      When you guys weren't struggling, we know that when you came up to the landing, he was pointing the gun at you?

A.      For a split second before I grabbed it.

Q.      And then after you lost control, he was pointing the gun at you?

A.      Again, a fraction of second.

Q.      When you lost control of his hand, what did you do?

A.      When I lost control of the gun?

Q.      Yes.

A.      I fired it.

Q.      Where was your gun at?

A.      My right hand, right side.

Q.      And did you have to pull it up and extend it forward to fire?

A.      No.  I fired it from right here (indicating).

-10-

Q.      Okay.  All three shots?

A.      Yes.

Q.      You didn't have your arm extended out?

A.      No.

Q.      So your testimony is that you fired all three shots basically from the hip right here (indicating)?

A.      In that vicinity, yes.

Q.      I know this happened quickly, but I want to ask, do you remember if you were standing straight up or were you crouched over at the time that you fired these shots?  What was your positioning when you fired the first shot?

A.      I believe I was crouched a little bit, bent over at the waist.

Q.      How about the second and third shots?

A.      Same.  It was in quick succession.

Q.      And when you say that the timing of the shots were in quick succession, are you saying that the time from the first shot to the second shot was the same timing as the second shot to the third shot?

A.      Yes.

Q.      There were no delays in the shots?

A.      I don't believe so.

Q.      And when you say quick succession, are you saying tac tac tac?

A.      Correct.

. . .

A.      What was the next question again, please?

Q.      The time frame from when you first encountered Mr. Neace to the final shot as far as seconds.

-11-

> A.   Four, six, seven, somewhere around there.  It wasn't long at all, just a few seconds.
>
> Q.   I'm talking about you first see him, you see the gun, you have this struggle with him and then you fire three shots.  You're saying under ten seconds or –
>
> A.   I would have to say yes.  Everything was kind of tunnel vision at that point.  I didn't really count seconds.

(Watson Dep. at 134-37, 139.)

After Officer Watson described his version of events, he was asked to comment on the Plaintiff's version:

> Q.   And if he [the Plaintiff] testifies that you were the one pointing the gun at him and that the struggle was with your gun, that would not be true?
>
> A.   That would be absolutely not true.
>
> . . .
>
> Q.   Did you happen to see where Mr. Neace's gun went, or did you see it?
>
> A.   Yeah.  I kicked it down the steps.
>
> Q.   When did you kick it?
>
> A.   As soon as it hit the floor.
>
> Q.   When did it hit?
>
> A.   After the third shot.
>
> Q.   You don't remember it hitting the floor before the third shot?
>
> A.   No.
>
> Q.   So you saw the gun and kicked it?
>
> A.   Yes.
>
> Q.   I assuming [sic] that it was all in one piece?

> A.    Yes.  I told one of the officers coming up the steps to be careful, it was evidence, but I don't know who that officer was.
>
> . . .
>
> Q.    And then I gather from your testimony that when you lost control of his gun and he pointed it at you, that's when you fired?
>
> A.    Yes.

(Watson Dep. at 140-43, 177.)

The third shot damaged the Plaintiff's spine, rendering him paralyzed from the chest down.  His mother provides him with 24-hour care.  (Shay Neace Aff. at ¶ 12.)

On March 19, 2004, Plaintiff Shay Neace filed this action pursuant to 42 U.S.C. § 1983 against Officer Watson, numerous "John Doe" officers who participated in the raid, and the municipalities of Perry Township and Massillon, Ohio.  He alleges that his rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution were violated during the raid when he was shot by Officer Watson.  His mother, Michele Neace, brings a derivative claim for loss of consortium and services.

In the current motions, the Defendants seek summary judgment.  Officer Watson, the only named individual Defendant, asserts that he is entitled to qualified immunity and that he did not act in any matter that violated Shay Neace's constitutional rights.  The municipal defendants further assert that they cannot be liable for the conduct of any of the individual officers, including Officer Watson.

## II.  LAW AND ANALYSIS

### A.  Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to

-13-

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

The party moving for summary judgment bears the initial burden of production under Rule 56.  The burden may be satisfied by presenting affirmative evidence that negates an element of the non-movant's claim or by demonstrating "an absence of evidence to support the non-moving party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

If the movant meets this burden, the non-movant must "set forth the specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  The substantive law identifies which specific facts are material.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  To avoid summary judgment, the non-movant must "make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.

"The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Anderson, 477 U.S. at 256 (citing Adickes v. Kress & Co., 398 U.S. 144, 158-59 (1970)).  However, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  "[T]he mere existence of some alleged factual disputes between the parties will not defeat an otherwise properly supported motion" for summary judgment. Anderson, 477 U.S. at 247-48.

B.  Qualified Immunity

42 U.S.C. § 1983 provides a remedy for the deprivation under color of state law of any

right, privilege, or immunity secured by the Constitution or laws of the United States.[4]  The

elements of a claim under section 1983 are: (1) the deprivation of a federal right, and (2) the

deprivation was committed by one acting under color of state law.  West v. Adkins, 487 U.S. 42,

48 (1988); Searcy v. City of Dayton, 38 F.3d 282, 286 (6th Cir. 1994); United of Omaha Life

Insurance Co. v. Solomon, 960 F.2d 31, 33 (6th Cir. 1992).  Plaintiff Shay Neace claims that his

constitutional rights were violated when the Defendants used unreasonable and excessive force,

thereby committing an unreasonable seizure against him.

Officer Watson, the only named individual Defendant, asserts the defense of qualified

immunity.  Government officials performing discretionary functions are shielded from liability

unless their conduct violates clearly established statutory or constitutional rights of which a

reasonable person would have known.  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982);

Gardenhire v. Schubert, 205 F.3d 303, 310-11 (6th Cir. 2000); Chappel v. Montgomery County

Fire Protection District No.1, 131 F.3d 564, 573 (6th Cir. 1997); Pray v. City of Sandusky, 49

F.3d 1154, 1157 (6th Cir. 1995); Garvie v. Jackson, 845 F.2d 647, 649 (6th Cir. 1988).

The Sixth Circuit applies a three-step analysis in determining whether a plaintiff has

overcome the defense of qualified immunity.  First, the Court determines whether, viewing the

evidence in the light most favorable to the plaintiff, he has shown that a constitutional violation

---

[4]        42 U.S.C. § 1983 states in relevant part:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of Columbia,
> subjects, or causes to be subjected, any citizen of the United States or
> other person within the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the Constitution and laws,
> shall be liable to the party injured in an action at law, suit in equity, or
> other proper proceeding for redress.

has occurred. Second, the violation must have involved a clearly established constitutional right of which a reasonable person would have known. Third, the plaintiff must demonstrate that the official's conduct was objectively unreasonable in light of the clearly established constitutional rights. Dean v. Byerley, 354 F.3d 540, 557 (6th Cir. 2004); Feathers v. Aey, 319 F.3d 843, 848 (6th Cir. 2003); Flagner v. Wilkinson, 241 F.3d 475, 480-81 (6th Cir.), cert. denied, 534 U.S. 1071 (2001); Dickerson v. McClellan, 101 F.3d 1151, 1157-58 (6th Cir. 1996).

The Defendants allege that the Plaintiff cannot satisfy the first and second prongs because he has not shown that there occurred a violation of a clearly established constitutional right. To determine whether a right is "clearly established", the Court must first look to the decisions of the Supreme Court, and then to the decisions within the Sixth Circuit. The contours of the right must be sufficiently clear that a reasonable official would understand when his conduct violates the right. Ewolski v. City of Brunswick, 287 F.3d 492, 501 (6th Cir. 2002); Gardenhire v. Schubert, 205 F.3d 303, 311 (6th Cir. 2000); Russo v. City of Cincinnati, 953 F.2d 1036, 1042 (6th Cir. 1992) .

The Defendants argue that the Plaintiff cannot demonstrate a violation of a clearly established constitutional right because the entry and search of Estep's home were legal. To have standing to challenge a search or seizure as unreasonable, one must have a subjective expectation of privacy in the object thereof, and society must be willing to recognize such expectation as legitimate. California v. Ciraolo, 476 U.S. 207, 211 (1986); United States v. Berryhill, 352 F.3d 315, 316 (6th Cir. 2004); Sangineto-Miranda, 859 F.2d 1501, 1510 (6th Cir. 1988). The Defendants focus on the Plaintiff's lack of an expectation of privacy in Estep's home. As a transient visitor there for a party, the Defendants are correct that the Plaintiff had no

-16-

expectation of privacy with respect to the search of the home.  See Berryhill, 352 F.3d at 317.

The Defendants also argue that Officer Watson is entitled to qualified immunity because he was justified in arresting the Plaintiff for drug and gun crimes.  The Plaintiff possessed marijuana and brandished a weapon.  A warrantless arrest is justified if at the time of the arrest, the police have probable cause to believe a criminal offense has been, is being, or will be committed.  United States v. Sangineto-Miranda, 859 F.2d 1501, 1508 (6th Cir. 1988).  Probable cause exists when facts within the officer's knowledge would cause a reasonably prudent person to believe a crime is being or will be committed.  United States v. Carrillo, 269 F.3d 761, 766 (7th Cir. 2001); Sangineto-Miranda, 859 F.2d at 1508.  An officer has qualified immunity from suit if a reasonable officer would believe an arrest to be with probable cause in light of the information available.  Hunter v. Bryant, 502 U.S. 224, 227 (1991).  Officers who reasonably, but mistakenly, believe probable cause is present are entitled to immunity.  Hunter, 502 U.S. at 227.  Under these standards, Officer Watson had probable cause to arrest the Plaintiff because he had marijuana and brandished a weapon.

The Defendants' focus, however, misses the point.  The Plaintiff does not challenge the entry into and search of the home, nor even whether he should have been arrested.  Rather, the Plaintiff challenges the actual shooting.  The rights to be free from unreasonable searches and seizures, including excessive force, are clearly established rights of which a reasonable officer would know.  Pray v. City of Sandusky, 49 F.3d 1154, 1157 (6th Cir. 1995); Adams v. Metiva, 31 F.3d 375, 386-87 (6th Cir. 1994).  In addition, an individual has a clearly established right not to be shot unless he poses a threat to a pursuing officer or others.  Dickerson v. McClellan, 101 F.3d 1151, 1163 (6th Cir. 1996); Russo, 953 F.2d at 1045; Yates v. City of Cleveland, 941 F.2d

-17-

444, 447 (6th Cir. 1991).   The Plaintiff argues that the shooting itself was a violation of his

clearly established right to be free from excessive force, regardless of what else occurred.  The

Court agrees.  Accordingly, the Defendants cannot avoid liability merely by demonstrating that

their entry into and search of Estep's home were proper, or that the Plaintiff was properly

arrested.  The Plaintiff's claim of excessive force in being shot must be analyzed independently.

The Plaintiff, therefore, satisfies the first two prongs to overcome qualified immunity.

Under the third prong to overcome qualified immunity, the Plaintiff must demonstrate

that Officer Watson's conduct was unreasonable under the circumstances.  The apprehension by

use of deadly or otherwise excessive  force is a seizure subject to the reasonableness requirement

of the Fourth Amendment.  Graham v. Connor, 490 U.S. 386, 394-95 (1989); Tennessee v.

Garner, 471 U.S. 1, 7 (1985); Phelps v. Coy, 286 F.3d 295, 299 (6th Cir. 2002); Dickerson v.

McClellan, 101 F.3d 1151, 1161 (6th Cir. 1996).  Whether force was excessive or reasonable is

an objective standard determined based on the totality of the circumstances.  Dickerson, 101

F.3d at 1162, citing, Graham, 490 U.S. at 395; Phelps, 286 F.3d at 299; Russo, 953 F.2d at 1044.

Deadly force is justified when an officer has probable cause to believe that a suspect poses a

threat of serious harm to the officer or others.  Garner, 471 U.S. at 11.

Reasonableness must be judged from the perspective of a reasonable officer on the scene,

and not with the 20/20 vision of hindsight.  There must be allowance for the fact that police

officers are often forced to make split-second judgments under circumstances that are tense,

uncertain, and evolving rapidly.  Graham, 490 U.S. at 396-97.  Reasonableness also can be

analyzed in segments, affording distinct consideration to each portion of the conduct as events

evolved.  Phelps, 286 F.3d at 301; Claybrook v. Birchwell, 274 F.3d 1098, 1103-04 (6th Cir.

-18-

2001); <u>Dickerson</u>, 101 F.3d at 1162.

Whether Officer Watson acted reasonably depends upon whose version of the facts is accepted.  Summarizing the deposition testimony quoted above, Officer Watson gave the following version of events.  Upon entry, officers identified themselves as police executing a warrant, and he himself wore a jacket emblazoned with the word "police".  While facing the upstairs bedroom with his gun drawn and pointed forward, the Plaintiff exited the adjacent bathroom and pointed a gun at Officer Watson.  They then struggled over the *Plaintiff's* gun.  During the struggle, Officer Watson lost control of the Plaintiff's gun, after which Officer Watson fired three shots from his own gun in rapid succession.  The entire incident lasted as little as seven seconds, perhaps less.  The third shot pierced the Plaintiff's back because during the struggle they wound up in "funny positions".

Again summarizing the deposition testimony quoted above, the Plaintiff gave the following, considerably different, version of events.  He heard a commotion outside the bathroom and opened the door just as Officer Watson was forcing his way inside.  The Plaintiff saw no indicia that the intruder was a police officer, and the Plaintiff merely found himself with a gun pointed at his head by an unknown individual.  The Plaintiff had Estep's gun, disassembled into three pieces, in his hand, but he dropped the pieces immediately and grabbed Officer Watson's gun.  They struggled, therefore, over *Officer Watson's* gun, not Estep's.  After the first shot, which missed, the Plaintiff raised his arms and backed away.  Subsequently, Officer Watson fired a second shot, which struck the Plaintiff in the shoulder and buckled him to his knees.  He was nearly on the ground when the third shot was fired to his back.  The incident lasted as much as fifteen seconds.  The Plaintiff's version is supported by affidavits of others

-19-

who were in the bathroom. In addition, he submits an expert's affidavit who opines that, at least

assuming much of the Plaintiff's version, Officer Watson acted unreasonably. (See Docket No.

71, Ex. E.)[5]

      The gravamen of the difference between the two versions amounts to whether the

shooting occurred incident to the struggle, or whether the shooting occurred once the struggle

was over and the Plaintiff had surrendered. In the details, the parties differ on at least the

following facts relevant to whether Officer Watson acted reasonably: (1) whether Officer

Watson gave or was wearing any indication that he was a police officer; (2) whether the Plaintiff

exited the bathroom with a gun pointed at Officer Watson, or whether Officer Watson forced his

way into the bathroom with his gun pointed at the Plaintiff; (3) whether Estep's gun was

disassembled; (4) whether the Plaintiff immediately dropped Estep's gun, and which gun was the

object of the struggle; (5) the total duration of the incident; (6) whether the three shots were fired

---

[5]      The Defendants argue that the Plaintiff's deposition testimony is inconsistent with his affidavit, and therefore should be disregarded. Although the affidavit is far broader and omits many of the details elicited at deposition, the two are not necessarily inconsistent. The Defendants largely focus on the affidavit statement, in paragraph six, that the Plaintiff "did not have a gun in my hand while I attempted to defend myself ", and the statement in paragraph nine that the Plaintiff never pointed a gun at anyone. The Defendants argue that these statements are inconsistent with the deposition testimony that the Plaintiff had the disassembled gun in the palm of his hand at the start of the encounter. The Plaintiff, however, further testified that he dropped Estep's gun prior to grabbing Officer Watson's gun. Thus, at least according to the Plaintiff, he had no gun in his hand during the actual struggle. In addition, the Plaintiff asserts that although he initially had the gun in his hand, he never pointed it at Officer Watson. Again, although the affidavit is unspecific in many respects, it is not inconsistent with the deposition testimony when viewed in the light most favorable to the Plaintiff. The Defendants further argue that his deposition testimony is inconsistent with his testimony at his criminal trial, and other statements given to investigators. Although any alleged inconsistencies may be raised at trial for impeachment purposes, they do not warrant a grant of summary judgment.

in rapid succession or slightly spaced apart; and (7) whether the Plaintiff raised his arms and backed away, surrendering himself, after the first shot.

The existence of qualified immunity ordinarily is a question of law, Chappel, 131 F.3d at 573, and the Plaintiff bears the ultimate burden of proof that the Defendants are not entitled to qualified immunity.  Gardenhire, 205 F.3d at 311; Pray, 49 F.3d at 1158.  Summary judgment, however, is not appropriate when a genuine issue of material fact exists on a question on which the immunity turns.  Gardenhire, 205 F.3d at 311; Dickerson, 101 f.3d at 1158.   A jury becomes the final arbiter of an immunity claim when resolution of the issue depends upon which view of the facts is accepted.  Pray, 49 F.3d at 1161; Adams v. Metiva, 31 F.3d 375, 387 (6th Cir. 1994). Because of the factually different versions of events, summary judgment is not appropriate on the defense of qualified immunity.  A jury must choose between the two conflicting accounts.[6]

C.  Municipal Liability

Defendant Massillon has filed its own motion for summary judgment on the ground that there is no city policy upon which municipal liability can be based.[7]  Under 42 U.S.C. § 1983, a municipality cannot be liable for the actions of its employees under the principle of *respondeat superior*.  Rather, there must be a municipal policy or custom that itself causes the deprivation of

---

[6]     When, as here, a court denies summary judgment on qualified immunity because of a dispute on the underlying factual issues relevant thereto, there is no right to immediate appeal.  Johnson v. Jones, 515 U.S. 304, 307, 319-20 (1995); Behrens v. Pelletier, 516 U.S. 299, 313 (1996).

[7]     Defendant Perry Township and its Board of Trustees argue that they are entitled to summary judgment because of Officer Watson's qualified immunity.  This argument lacks merit for the same reasons that summary judgment is denied as to Officer Watson himself.  They make no additional arguments for summary judgment based upon the distinct principles governing municipal liability.

a federal right, thereby rendering the governmental entity directly responsible for the injury. Monell v. Department of Social Services, 436 U.S. 658, 691-95 (1978); Stemler v. City of Florence, 126 F.3d 856, 865 (6th Cir. 1997).  The municipality must have acted with "deliberate indifference" as to known or obvious consequences of its policy.  Board of County Commissioners of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 407 (1997), citing, City of Canton v. Harris, 489 U.S. 378, 388 (1989).

An "official policy" refers to formal rules or understandings, which can be but are not always in writing, that are intended to and in fact establish fixed plans of action to be followed under similar circumstances consistently and over time.  Pembaur v. City of Cincinnati, 475 U.S. 469, 480-81 (1986).  Municipal liability attaches only when a deliberate choice is made to follow a course of action from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.  Pembaur, 475 U.S. at 483. When the policymaker with final authority delegates his authority to a subordinate, the municipality may be liable by ratification and approval of the subordinate's decision.  City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988).  In addition, a policy can be created by custom if it is so permanent and well-settled as to acquire the force of law.  Doe v. Claiborne County, 103 F.3d 495, 507 (6th Cir. 1996).

The Plaintiff also must show that the particular injury was caused by the execution of the policy or custom at issue.  Searcy v. City of Dayton, 38 F.3d 282, 287 (6th Cir. 1994); Stemler, 126 F.3d at 865.  There must be an affirmative link between the policy and the alleged constitutional violation.  Oklahoma City v. Tuttle, 471 U.S. 808, 823 (1985).  Claiborne County, 103 F.3d at 507.

-22-

The Plaintiff alleges that the policies (or lack of policies) upon which Massillon's liability is based include the failure to train officers adequately in how to conduct raids, and the failure to supervise officers, particularly in making decisions as to when and how to conduct raids.   With respect to Massillon's policies in connection with raids, the Plaintiff deposed Mark Weldon, the Chief of Police at that time, and Sergeants Keith Moser and Thomas J. Minarcheck, who participated in and supervised the raid.[8]

There are no written or specific unwritten policies in Massillon governing how raids are to be conducted, and the officer in charge has the authority to assemble the team, gain entry to the target, and otherwise execute the raid.  This also includes whether or not to call in the regional "START" team, a specialized, multi-jurisdictional SWAT-like team specially trained for high-risk raids.  (Weldon Dep. at 18-20, 23, 36; Moser Dep. at 21-22; Minarcheck Dep. at 27.)  The raid team in this case was assembled immediately prior to the raid's execution by selecting officers available at the station, and without contacting either Chief Weldon or the START team.  Some of the officers involved in this incident had no prior experience or specific training in conducting raids.  (Moser Dep. at 19, 39-40.)  Defects in the raid allegedly included the lack of advanced warning of the number of people present in the home, which resulted in too few officers being present.  There also is no policy for review and analyzing raids afterward to determine whether mistakes were made so raid techniques can be improved.  (Weldon Dep. at 13, 24; Moser Dep. at 13; Minarcheck Dep. at 9-10.)

The Plaintiff argues that inadequate training and supervision in connection with

---

[8]        The deposition transcripts of Weldon, Moser, and Minarcheck are Docket Nos. 60, 61, and 62, respectively.

-23-

executing raids resulted in an ill-prepared, faulty raid in this instance which caused the shooting. When the alleged policy defect is a failure to train police officers, municipal liability attaches when such failure amounts to deliberate indifference to the rights of persons with whom the officers may come into contact.  City of Canton v. Harris, 489 U.S. 378, 388 (1989); Russo v. City of Cincinnati, 953 F.2d 1036, 1046 (6th Cir. 1992).  In light of duties assigned to officers, the need for more or improved training may be so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that city policymakers can reasonably be deemed deliberately indifferent to the need.  Canton, 489 U.S. at 390.  In addition, the deficiency in the training must be closely related to or have caused the ultimate injury.  Canton, 489 U.S. at 391; Russo, 953 F.2d at 1046.

The Court concludes that the issue of municipal liability in this case is a question for a jury.  When viewed in the light most favorable to the Plaintiff, Massillon's lack of any policies or regimental training in the conduct of raids arguably resulted in a defective raid with too few officers, some of whom were inadequately experienced.  These deficiencies arguably caused the shooting of the Plaintiff.  Defendant Massillon, therefore, is not entitled to summary judgment.

-24-

III.  <u>CONCLUSION</u>

For the foregoing reasons, the Motion For Summary Judgment of Defendants Perry Township, Ohio, its Board of Commissioners, and Defendant William Watson (Docket No. 52) is DENIED.  The Motion For Summary Judgment of Defendant City of Massillon, Ohio (Docket No. 63) also is DENIED.

IT IS SO ORDERED.


Issued: September 14, 2006                     ___*s/ John R. Adams*_____
                                                UNITED STATES DISTRICT JUDGE